IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DARRYL FRASE, | ) | CASE NO. 5:13-cv-02690 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Darryl Frase ("Plaintiff" or "Frase") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I.  Procedural History

Frase filed applications for DIB and SSI on November 5, 2010.  Tr. 11, 87-88, 89, 104, 119, 135.  He alleged a disability onset date of January 1, 2004 (Tr. 89, 104, 119, 135, 232, 239, 263, 267) and he alleged disability due to back problems and degenerative disc disease (Tr. 89,

104, 119, 135, 155, 159, 162, 166, 175, 179, 181, 185).[1]  After initial denial by the state agency

(Tr. 155-168) and denial upon reconsideration (Tr. 175-187), Frase requested a hearing (Tr. 188-

189).  An administrative hearing was held before Administrative Law Judge Paula J. Goodrich

("ALJ") on July 2, 2012.  Tr. 36-71.

     In her September 12, 2012, decision, the ALJ determined that Frase had not been under a

disability from September 4, 2010, through the date of the decision.[2]  Tr. 8-28.  Frase requested

review of the ALJ's decision by the Appeals Council.  Tr. 6-7.  On November 13, 2013, the

Appeals Council denied Frase's request for review, making the ALJ's decision the final decision

of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal, educational, and vocational evidence

     Frase was born in 1962.  Tr. 42, 232, 239, 294.  He was 50 years old at the time of the

administrative hearing.  Tr. 40.  He is divorced with two minor children.[3]  Tr. 56, 335.  At the

time of the hearing, Frase was living in a mobile home with his girlfriend.[4]  Tr. 42-43.  He was

not working.  Tr. 43.  He was receiving food assistance and had recently received a medical card.

Tr. 43.  Frase has a driver's license but does not drive very often.  Tr. 43.  His girlfriend usually

drives.  Tr. 43-44. He completed school through the 12th grade. Tr. 44, 268, 336.  Frase also

---

[1] Frase does not appear to have initially alleged a mental impairment.  However, the Administrate Law Judge ("ALJ") found severe physical and mental impairments.  Tr. 13-14.

[2] Frase had received a prior disability decision dated September 3, 2010, wherein the ALJ concluded that Frase was not disabled from December 31, 2003, through the date of that decision.  Tr. 11, 72-86.  In his November 5, 2010, applications, Frase alleged a disability onset date of January 1, 2004.  Tr. 11.  However, in her September 12, 2012, decision, the ALJ indicated "application of doctrine of *res judicata* dictates that the earliest possible onset date is September 4, 2010, the day after the date of the prior decision."  Tr. 11.

[3] Frase indicated that his wife divorced him when she found out he was no longer able to work.  Tr. 57.  Following the divorce, there was a no contact order in place between Frase and his children.  Tr. 57-58.  Frase is now able to text, call or write his children and has seen them a few times.  Tr. 58-59.

[4] He was homeless for a few years and then moved in with his dad.  Tr. 57.  Thereafter, he met his girlfriend.  Tr. 57.

completed a carpenter's union apprenticeship in 1986 and worked as a carpenter until 2003 when he stopped working.  Tr. 267, 268, 336.

**B.     Medical evidence**

**1.      Treating physician**

*__2011__*

On May 11, 2011, Frase saw Dr. Steven Stasiak, M.D.[5]  Tr. 351-352.  Frase complained of back, leg and foot pain and some shoulder pain.  Tr. 351.[6]  He also complained that both legs were weak.  Tr. 351.  He had undergone a laminectomy in 2002.  Tr. 351.  Frase reported having been involved with pain management and on Oxycontin in the past.  Tr. 351.  He also reported that he had tried to get on disability but was denied.  Tr. 351.  He indicated that, with the pain, he was unable to work.  Tr. 351.  He was not taking any prescriptions or over the counter medications.  Tr. 351.  On examination, Frase exhibited normal upper and lower extremity reflexes, his cranial nerves were intact, he had no focal deficits, and he had normal pulses in his extremities.  Tr. 351.  Dr. Stasiak's assessment was that Frase had intervertebral disc disorder with myelopathy lumbar region and unspecified arthropathy involving shoulder region.  Tr. 351.  He noted that Frase "[d]oes still look like [he] is permanently disabled" and that he could "fill out forms when they come thru."  Tr. 351.  Dr. Stasiak also noted that he would like a shoulder and back MRI but Frase could not afford them at that time.  Tr. 351.

On September 20, 2011, Frase saw Dr. Stasiak with complaints of back, leg and arm pain.  Tr. 374.  Frase reported having just received a medical card and wanting treatment.  Tr. 374.  He reported that recently his fingers had been going numb, with the numbness being worse on the right than the left.  Tr. 374.  He indicated that shaking his hands and holding them at his sides

---

[5] The May 11, 2011, treatment notes reflect that Frase was there to "re-establish."  Tr. 351.

[6] The May 11, 2011, treatment record is also located in the record at Tr. 376.

seemed to help.  Tr. 374.  Frase was having shoulder pain.  Tr. 374.  Also, his back and leg pain

was still a problem and limited his mobility and interfered with his sleep.  Tr. 374.  Frase had

been discharged from pain management in the past.[7]  Tr. 374.  On examination, Frase's pulses

were normal.  Tr. 374.  He had normal upper and lower extremity reflexes, his cranial nerves

were intact, and he had no focal deficits.  Tr. 374.  Dr. Stasiak's assessment was intervertebral

disc disorder with myelopathy lumba[r]; unspecified arthropathy involving shoulder region; pain

in limb; and carpal tunnel syndrome.  Tr. 374.  Dr. Stasiak ordered a bilateral extremity EMG to

look for carpal tunnel or cervical disc issue and lumbar nerve damage.  Tr. 374-375.  Dr. Stasiak

also recommended that Frase stop smoking.  Tr. 374.

The EMG was performed on September 22, 2011, along with a physical examination.[8]

Tr. 364-365.  Manual muscle testing performed as part of the physical examination showed

"normal strength in the upper extremities aside from some mild giveaway" and that Frase's

reflexes were "reduced but symmetrical in the upper and lower extremities."  Tr. 364.  The

conclusions from his September 22, 2011, visit and nerve conduction studies were:

1. There is electrophysiologic evidence of bilateral median neuropathies with focal conduction block at the wrist consistent with carpal tunnel syndrome.  This graded as moderately severe on the left and mild on the right.

2. There is electrophysiologic evidence of bilateral L4 radiculopathies without evidence of active denervation by today's examination.

3. There is also electrophysiologic evidence of a chronic right C6/7 radiculopathy.

4. The patient was advised to follow up with Dr. Stasiak for further intervention regarding the results of today's testing.

Tr. 365.

---

[7] He was on Oxycontin but stopped and switched to methadone.  Tr. 374.  He continued to have severe pain and withdrawal so he used marijuana which turned up in a urine screen and he was discharged from pain management.  Tr. 374.  Frase indicated that he did not want to take a chance on getting addicted to Oxycontin again.  Tr. 374.

[8] Dr. Karen Gade-Pulido, M.D., prepared the report from the September 22, 2011, EMG studies.  Tr. 364-365.

_**2012**_

Frase saw Dr. Stasiak again on June 22, 2012.  Tr. 357-362.  The reason for his visit was "disability."  Tr. 357.  Frase reported weakness and fatigue.  Tr. 357.  Dr. Stasiak indicated that Frase had vision problems, including vision loss on his right side for over a year, an eye injury more than two months prior (with onset 20-30 years prior), myodesopsia for more than three weeks, and photophobia.  Tr. 357.  Dr. Stasiak also noted "[d]izziness and syncope sensation when visual loss."  Tr. 357.  Frase had a prior cataract surgery.  Tr. 360.  Frase reported dyspnea and chest pain.  Tr. 357.  He was wheezing during the office visit.[9]  Tr. 357.  With respect to his back pain, Frase reported that his back pain was worse at night and precipitated by activity.  Tr. 358.  Frase's leg pain was precipitated by walking 50 feet.  Tr. 358.  He reported having problems sleeping.  Tr. 358.  With respect to his activities of daily living, Frase indicated that "Pain interfered a great deal with normal work in the past 4 weeks. Back pain prevents working. Dyspnea interferes with activities of daily living.  Daily activities extremely difficult because of psychological symptoms.  Activities of daily living extremely difficult because of anxiety."  Tr. 360. On examination, Dr. Stasiak indicated that Frase's motor strength was 5/5 proximally and distally in his bilateral extremities.  Tr. 361.  Frase showed no focal deficits.  Tr. 361.  His sensation was grossly intact to light touch bilaterally.  Tr. 361.  His reflexes were "2+ and symmetrical bilaterally at knees and achilles."  Tr. 361.  His gait was within normal limits.  Tr. 361.  Dr. Stasiak's assessment was that Frase had intervertebral disc disorder with myelopathy lumba[r]; unspecified arthropathy involving shoulder region; pain in limb; carpal tunnel syndrome; dietary surveillance and counseling; and depressive disorder.  Tr. 361, 362.  Dr. Stasiak indicated "We will complete disability forms.  Given above information, pt should be considered as fully disabled."  Tr. 361.

---

[9] Frase reported smoking one pack of cigarettes per day.  Tr. 360.

Also, on June 22, 2012, Dr. Stasiak completed a Physician Questionnaire (Physical) (Tr. 353-354) and a Physician Questionnaire (Psychological) (Tr. 355-356).  Dr. Stasiak indicated that he had seen Frase on three occasions, one of those dates being the date the questionnaires were completed.[10]  Tr. 355.  Dr. Stasiak's diagnoses were intervertebral disc disorder with myelopathy, lumbar and depressive disorder.  Tr. 353, 355.  He opined that Frase would have the following functional limitations if placed in a competitive work situation: sit for a total of one hour in an eight-hour workday; unable to stand or walk during an eight-hour workday; lift up to 3 pounds occasionally, i.e., one-third of the day; and would require unscheduled breaks throughout the day up to several times per hour.  Tr. 353-354.  Dr. Stasiak also opined that Frase would be unable to sustain an eight-hour workday, five days per week; Frase's symptoms were severe enough to interfere with attention and concentration necessary to perform simple tasks on a daily basis; Frase's ability to get along with co-workers, supervisors, and the general public was limited; Frase was unable to maintain prolonged concentration.  Tr. 355-356.  Dr. Stasiak also opined that Frase would miss work every day since he is disabled.  Tr. 354.

## 2.      Consultative examining physicians

### *Physical*

On January 18, 2011, Dr. Steven Rodgers, M.D., conducted a physical consultative examination.  Tr. 344-350.  On examination, Dr. Rodgers noted that Frase appeared to be in no apparent distress but he had some difficulty with ambulation and getting on and off the examination table because of back pain.  Tr. 345.  Neurologically, among other notations, Dr. Rodgers noted that Frase showed motor deficits involving the right upper extremity with decreased strength involving the shoulder and the elbow extensor muscles; his balance of motor function was within normal limits and sensation was intact; his deep tendon reflexes were

---

[10] Dr. Stasiak reported having seen Frase on May 11, 2011, September 20, 2011, and June 22, 2012.  Tr. 355.

symmetrical in both the upper and lower extremities; straight leg testing was negative bilaterally; he is right-handed and the manual muscle testing appeared to be reliable; there were no muscle spasm or abnormal reflexes; there was muscular atrophy; he was able to hold things and dress and undress without assistance.  Tr. 345.  Dr. Rodgers' musculoskeletal examination showed that Frase's upper and lower extremities including his joints appeared essentially normal.  Tr. 345.  There was no swelling, redness, or deformity.  Tr. 345.  There was no crepitus noted on range of motion of any of the joints.  Tr. 345.  There was no tenderness involving the cervical, thoracic, or lumbar spine regions. Tr.  345.  There was no tenderness involving the upper or lower extremities.  Tr. 345.  Frase's cervical range of motion, range of motion of his shoulders, and range of motion of his dorsal lumbar spine were decreased.  Tr. 345-346.  Frase's range of motion of his elbows, wrists, hands and fingers and hips, knees and ankles was normal bilaterally.  Tr. 345-346.  Frase's pulses were normal in both the upper and lower extremities. Tr. 346.

Dr. Rodgers opined that Frase had low back pain – status post laminectomy and right shoulder pain and stated:

> My medical assessment of the claimant's ability to do work-related activities include bending, twisting, and overhead work, limited to occasional status.  He has no limitations regarding his hearing, speech, or use of his hands.  He did exhibit markedly decreased vision in the left eye.

Tr. 346.

### ***Psychological***

On January 11, 2011, psychologist Dr. Michael J. Harvan, Ph.D., conducted a psychological consultative examination.  Tr. 335-341.  Based on his clinical interview, Dr. Harvan opined that the following diagnoses were suggested: major depressive disorder; alcohol

dependence (sustained full remission); and cannabis dependence (early full remission).[11] Tr. 340. Dr. Harvan assessed Frase with an overall GAF score of 50.[12] Tr. 340. He opined that Frase was limited as follows: (1) his ability to understand and follow instructions was moderately impaired; (2) his ability to maintain attention to perform simple or multi-step repetitive tasks was markedly impaired, primarily because of his numerous tangential comments and rambling during the course of the evaluation; (3) his ability to relate to others, including fellow workers and supervisors, was markedly impaired, primarily because of his focus on his own issues and indicating that he has no friends; and (4) his ability to withstand the stress and pressures associated with day-to-day work activity was at least mildly impaired. Tr. 340-341.

### 3. State agency reviewing physicians

#### *Physical*

On March 4, 2011, state agency medical consultant Dr. William Bolz, M.D., completed a Physical Residual Functional Capacity Assessment ("Physical RFC") based on a medical review of the evidence. Tr. 96-98. Dr. Bolz opined that Frase had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push and/or pull unlimitedly, other than as shown for lift and/or carry. Tr. 96-97. Dr. Bolz opined that Frase would be limited to occasional climbing ladders, ropes, scaffolds and occasional stooping, kneeling, crouching, and crawling. Tr. 97. Dr. Bolz opined that Frase would be limited bilaterally to frequent overhead

---

[11] Dr. Harvan also noted reported back pain, degenerative disc disease and vision problems. Tr. 340.

[12] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

reaching due to degenerative joint disease.  Tr. 97.  Dr. Bolz opined that Frase had visual limitations and has limited near and far acuity on the left, limited depth perception in both eyes, and limited field of vision.  Tr. 98.

On reconsideration, on June 22, 2011, state agency medical consultant Dr. Gerald Klyop, M.D., completed a Physical RFC based on a medical review of the evidence and reached the same opinions as Dr. Bolz regarding Frase's RFC.  Tr. 96-98.

### ***Psychological***

On March 1, 2011, state agency medical consultant Douglas Pawlarczyk, Ph.D., completed a Psychiatric Review Technique ("PRT") and a Mental Residual Functional Capacity Assessment ("Mental RFC") based on a medical review of the evidence.  Tr. 94-95, 98-100.  Dr. Pawlarczyk opined that Frase's affective disorders were severe and his substance addiction disorders were non-severe; neither mental impairment met nor medically equaled a Listing.  Tr. 94-95.  He opined that Frase had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and no episodes of decompensation.  Tr. 95.  Dr. Pawlarczyk offered his opinions with respect to Frase's abilities in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation and opined that Frase would be limited to simple tasks; limited to carrying out simple tasks in a work environment with no strict production quotas and where there are only limited periods of sustained concentration required; limited to a work environment where no public contact is required and where contacts with co-workers are minimal; and limited to a static work environment.  Tr. 99-100.

On reconsideration, on June 17, 2011, state agency medical consultant Kristen Haskins, Psy. D., completed a PRT and a Mental RFC based on a medical review of the evidence.  Tr.

125-126, 130-132.  Dr. Haskins opined that Frase's affective disorders were severe and his

substance addiction disorders were non-severe; neither mental impairment met nor medically

equaled a Listing.  Tr. 125-126.  She opined that Frase had moderate restriction of activities of

daily living; moderate difficulties in maintaining social functioning and in maintaining

concentration, persistence or pace; and no episodes of decompensation.  Tr. 126.  Dr. Haskins

offered her opinions with respect to Frase's abilities in the areas of understanding and memory,

sustained concentration and persistence, social interaction, and adaptation and opined that Frase

would be limited to simple tasks; limited to carrying out simple tasks in a work environment with

no strict production quotas and where there are only limited periods of sustained concentration

required; limited to a work environment with only superficial and occasional contact with others;

and limited to a static work environment.  Tr.  130-131.

**C.      Testimonial evidence**

**1.      Plaintiff's testimony**

Frase testified and was represented at the hearing.  Tr. 42-61.  Frase indicated that he was

unable to work because of his pain and weakness.  Tr. 44.  He is unable to sleep more than 3

hours.  Tr. 44.  He had previously undergone a laminectomy.  Tr. 44.  Before his laminectomy he

had been on Oxycontin and he was able to work.  Tr. 44.  Once he was no longer on Oxtcontin,

he was unable to function.  Tr. 44-45.  He has pain in his shoulder.  Tr. 45.  His arm hurts.  Tr.

45.  His hand hurts.  Tr. 45.  He drops things.  Tr. 45.

Frase's doctors have not suggested additional surgery for his back.[13]  Tr. 45-46.  They

have offered medication such as Vicodin but, because he had had problems with Oxycontin, he

declined additional medication.  Tr. 46.  The pain in his back goes down into the back of his

---

[13] Frase stated that his doctors have indicated that something could possibly be done with respect to his carpal tunnel. Tr. 46.

legs/calves and into his feet.  Tr. 53.  His feet and calves ache.  Tr. 53.  He is unable to sleep because his legs ache.  Tr. 53.  The aches are constant.  Tr. 53.  He never feels refreshed and always feels like he has to lie down.  Tr. 53-54.  Frase can stand for less than 10 minutes before he starts shifting his weight and squirming around.  Tr. 54.  After 15 minutes of standing, Frase has to sit or find something to lean on.  Tr. 54.  He can walk a little longer than he can stand because he is not trying to stand in one position.  Tr. 54-55.  However, after walking about 10 minutes from the parking deck to the hearing room he just wanted to sit down.  Tr. 54-55.  Frase is able to sit for about 20 minutes before he starts shifting in his seat.  Tr. 55.  He holds his weight on his arms to try to take pressure off of his back and he shifts from side to side. Tr.  55.

Frase described having problems with his left eye since he was 14 years old.  Tr. 50-51. He has tried surgery to correct his left eye problems but the last surgery that was performed to put a lens in his left eye was performed incorrectly.  Tr. 51.  In order to read or focus, he needs to wear a contact lens but had not had money to purchase the contact.  Tr. 51.  Frase noted that he recently received a medical card but was unsure whether it would cover the cost of the contact. Tr. 51.  His left eye does not dilate anymore and he is really sensitive to light.  Tr. 51.  Because his right eye has had to do all the work, he now has trouble focusing up close with that eye.  Tr. 51.

Frase has right shoulder and arm pain.  Tr. 52.  He is right handed.  Tr. 52.  He initially thought he was having a heart attack but was advised that he had nerve damage going up his arm. Tr. 52.  His elbow and shoulder hurt and the pain goes into his neck.  Tr. 52.  His level of pain varies from day to day.  Tr. 52.  Some days his pain is worse than others.  Tr. 52.  He drops things like milk.  Tr. 52.  Both of his shoulders hurt if he raises them above his head.  Tr. 52.  He is able to reach his right arm out in front but he would not want to hold it out.  Tr. 52.  He is able

11

to eat and drink but he is shaky at times.  Tr. 52-53.  He also has problems with his left shoulder and wrist but it is not as bad as on his right side.  Tr. 53.

Although he has now received a medical card, Frase was not certain he was going to pursue medical treatment or medications.  Tr. 60.  Frase is scared to take narcotics and feels that his body has been through enough and does not want to take medications and have it cause problems internally.  Tr. 60.  He stated he has already tried injections and therapy and they have not helped.  Tr. 61.  He stated that, if there was something that his family doctor thought might work, he believes his doctor would have made him aware of it.  Tr. 61.

Frase described a typical day as involving lying on his side during 80% of the day.  Tr. 45.  He is unable to lie flat on his back or stomach because his legs start getting numb.  Tr. 45.  He lies in the fetal position and switches from side to side.  Tr. 45.  His girlfriend takes care of him and does the household chores.  Tr. 45.  Once in a while he will make his girlfriend a cup of coffee.  Tr. 50.  He very seldom goes to the store.  Tr. 45.  During the hearing, he indicated that he wanted to lie down on the floor.  Tr. 45.  During the time that he is not lying down, he showers, sits and eats, lets his dog outside and lets him in.  Tr. 46.  Before living with his girlfriend, Frase lived with his father.  Tr. 50.  He did not have to help take care of his father because his father's wife cared for his father.  Tr. 50.  When he had been living with his father, he had been going to church three times each week.  Tr. 46-47.  However, since moving in with his girlfriend and since about Spring, he had not been regularly going to church with his father because his father was getting older and not going to church as often and Frase lived farther from his father, making it difficult with the cost of gas. Tr. 46-47.  When he attended church, it was difficult for him to sit through the service.  Tr. 47-48.  He plays Xbox during the day.  Tr. 48-49.  He sometimes has to rest and put the controller down because his hands will start tingling.  Tr.

12

49.  He indicated that he is not very good at the games and has some concentration problems.  Tr.

49.  He watches television during the day either in bed or changing positions.  Tr. 49.

In dealing with other people, Frase has no patience.  Tr. 55-56.  He gets along best with

his girlfriend.  Tr. 56.  She is the most understanding but he wonders how long that will last.  Tr.

56.  Before having pain issues, he got along with others, including co-workers, supervisors and

family members.  Tr. 56.

### 2.  Vocational expert's testimony

Vocational Expert Mark A. Pinti ("VE") testified at the hearing.  Tr. 62-69.  The VE

described Frase's past carpenter work as a medium, SVP 7 (skilled), job.[14]  Tr. 63, 308.  The

ALJ proceeded to ask the VE to assume an individual of Frase's age, education and past work

experience who is limited as follows: can occasionally lift and/or carry, including upward

pulling, 20 pounds; frequently lift and/or carry, including upward pulling, 10 pounds; stand

and/or walk with normal breaks for about 6 hours in an 8-hour workday; sit with normal breaks

for about 6 hours in an 8-hour workday; unlimited ability to  push  and pull other than limits for

lifting and/or carrying; can occasionally climb ladders, ropes, scaffolds; can occasionally stoop,

kneel, crouch, and crawl; overhead reaching is limited to frequent bilaterally; limited near acuity,

far acuity, and field vision on the left; limited depth perception when looking with both eyes;[15]

limited to simple tasks which could be learned in 30 days or less; limited to low-stress tasks, with

---

[14] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968 skilled work corresponds to an SVP of 5-9 in the DOT. *Id.* The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[15] Upon the VE's request for clarification as to whether the "limited"  meant "occasional,"  the ALJ clarified that she meant that the individual would "retain sufficient visual acuity to be able to handle and work with rather large objects and would have the visual fields necessary to avoid ordinary hazards in a workplace."  Tr. 64.

low stress defined as being precluded from tasks that involve being responsible for the safety of others and from directing the work of others; precluded from work that involves arbitration, negotiation, or confrontation; cannot perform work that involves strict time requirements and cannot perform work that involves high production quotas, such as piece work or assembly line work; and can only engage in occasional superficial interaction with supervisors, co-workers, or the public. Tr. 63-65. The VE indicated that the described individual would be unable to perform Frase's past work. Tr. 65-66. The VE indicated, however, that there would be light, unskilled work that the described individual could perform, including (1) laundry folder or garment folder with approximately 100 jobs in the regional economy, 500 statewide, and 40,000 nationwide; (2) housekeeping cleaner with approximately 1,000 jobs in the regional economy, 4,000 statewide, and 350,000 nationwide; and (3) machine tender with approximately 200 jobs in the regional economy, 1,000 statewide, and 120,000 nationwide. Tr. 66-67.

For her second hypothetical, the ALJ asked the VE to assume the individual described in the first hypothetical with the additional limitations of frequent handling and fingering on the right and occasional handling and fingering on the left. Tr. 67. With that additional limitation, the VE indicated that the described individual would be unable to perform the laundry folder job. Tr. 67-68. However, the described individual would still be able to perform the machine tender and cleaner jobs and would also be able to perform the job of produce worker with there being approximately 240 jobs in the regional economy, 2,000 statewide, and 68,000 nationwide. Tr. 68.

In response to a third and fourth hypothetical from the ALJ, the VE indicated that, if the individual described in the first or second hypothetical, due to a combination of medical conditions associated with pain and mental impairments, was also unable to engage in sustained

work activity for a full 8-hour workday on a regular and consistent basis, the individual would not be able to perform full-time work.[16]  Tr. 68.

Frase's counsel referred the VE to the consultative examiner's report (B5F4, Tr. 346) and asked the VE to assume the ALJ's first or second hypothetical and to assume that the individual was right handed and also limited to only occasional overhead work.  Tr. 69.  Frase's counsel then inquired as to whether those additional limitations would change the VE's earlier responses and the VE indicated that he did not believe so because none of the identified jobs required more than occasional overhead work.  Tr. 69.  Frase's counsel then asked whether the need for a supervisor, on a frequent basis, to keep the individual on task because of difficulty with focusing and concentration, would change the VE's responses.  Tr. 69.  The VE indicated that such a requirement would be deemed either an accommodation or result in non-competitive employment like a supportive workshop.  Tr. 69.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

---

[16] The ALJ noted that the third and fourth hypotheticals generally covered Dr. Steven Stasiak's medical source statement located in the record at 7F (Tr. 353-363). Tr. 68-69.

15

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her September 12, 2012, decision, the ALJ made the following findings:[17]

---

[17] The ALJ's findings are summarized.

1.     Frase met the insured status requirements through December 31, 2007. Tr. 13.

2.     Frase had not engaged in substantial gainful activity since January 1, 2004, the alleged onset date.  Tr. 13.

3.     Frase had severe impairments of disk disorder with myelopathy, lumbar, status-post laminectomy, C6-7 radiculopathy, L4 radiculopathy, degenerative disc disease of the lumbar spine, bilateral carpal tunnel syndrome, herniated disc, status-post laminectomy and bilateral L4-5 discectomy, spinal stenosis, post-laminectomy syndrome, vision loss left side, depressive disorder, major depressive disorder, pain disorder associated with psychological factors and a general medical condition, alcohol and cannabis abuse in remission.  Tr. 13-14.

4.     Frase did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 14-15.

5.     Frase had the RFC to perform light work except he may occasionally climb, stoop, kneel, crouch, crawl; frequently reach overhead bilaterally; frequently handle and finger with the right hand and occasionally handle and finger with the left hand; limited near acuity, far acuity and field of vision in his left eye and limited depth perception in both eyes, but retains sufficient visual acuity to be able to handle and work with rather large objects, and retains the visual fields to avoid ordinary hazards in the workplace; limited to simple tasks, which can be learned in thirty days or less; limited to low stress tasks [defined as being preclusive of work that involves arbitration, negotiation, confrontation, being responsible for the safety of, or directing the work of, others]; cannot perform work that involves strict time requirements, or work that involves high production quotas [such as piece-rate work or assembly line work]; can only engage in occasional and superficial interaction with supervisors, co-workers or the public. Tr. 15-21.

6.     Frase was unable to perform any past relevant work.  Tr. 22.

7.     Frase was born in 1962 and was 41 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  He subsequently changed age category to closely approaching advanced age. Tr. 22.

8.     Frase has at least a high school education and is able to communicate in English.  Tr. 22.

9.      Transferability of job skills was not material to the determination of disability.  Tr.22.

10.    Considering Frase's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Frase could perform, including machine tender, cleaner, and produce worker.  Tr. 22-23.

Based on the foregoing, the ALJ determined that Frase had not been under a disability from September 4, 2010,[18] through the date of the decision.  Tr. 23.

### V. Parties' Arguments

Frase argues that the ALJ did not assign proper weight to the opinions of his treating physician Dr. Stasiak and failed to properly apply the treating physician rule when evaluating Dr. Stasiak's opinions.  Doc. 14, pp. 11-14.  Frase also contends that the ALJ did not properly evaluate opinion evidence showing that he would be unable to complete a full eight hour workday of even sedentary work and that he had marked limitations in concentration and attention.  Doc. 14, pp. 14-16.  Therefore, Frase argues that the ALJ's RFC finding of light work with other limitations was not supported by substantial evidence. Doc. 14, pp. 14-16.

The Commissioner argues that the ALJ's decision is supported by substantial evidence and that the ALJ complied with the treating physician rule by stating the weight she assigned to Dr. Stasiak's opinions, provided reasons for that weight which are supported by the record, and fully considered and properly evaluated the other evidence.  Doc. 15, pp. 11-18.  Thus, the Commissioner argues that the decision should be affirmed.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

---

[18] See FN 2 above.

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A. The ALJ evaluated the opinions of Frase's treating physician Dr. Stasiak in accordance with the treating physician rule

Frase challenges the weight the ALJ assigned to the opinions of his family physician Dr. Stasiak, arguing that the ALJ should have assigned controlling weight to Dr. Stasiak's opinions and/or failed to articulate good reasons for the weight assigned.  Doc. 14, pp. 11-14.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (internal quotations omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are

19

sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  However, while an ALJ''s decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Dr. Stasiak offered opinions regarding both Frase's physical and mental impairments.  As discussed below, in accordance with the treating physician rule, the ALJ assigned weight to Dr. Stasiak's opinions and provided good reasons for the weight assigned.

### 1.  Dr. Stasiak's physical impairment opinions

On May 11, 2011, Dr. Stasiak saw Frase for complaints of back, leg, foot and right shoulder pain.  Tr. 351.  Dr. Stasiak indicated in his treatment notes from that visit that Frase "[d]oes still look like [he] is permanently disabled."  Tr. 351.  Also, on June 22, 2012, Dr. Stasiak opined that Frase could sit for one hour in an eight-hour workday; stand and/or walk for zero hours in an eight-hour workday; occasionally lift three pounds; would need unscheduled breaks several times per hour; and would entirely miss work because he was disabled.  Tr. 353-354.

With respect to those opinions, the ALJ stated:

Two opinions were received from claimant's treating source, Steven Stasiak, M.D.  One rendered May 11, 2011, reported that the claimant "looked like he's

permanently disabled."  The second rendered June 22, 2012, reported that the claimant could lift three pounds, could sit for one of eight hours, stand and/or walk for zero of eight hours and would always miss work since he was disabled. Dr. Stasiak treated the claimant and was reporting within the bounds of his professional certifications; however, the severity of his restrictions were not supported by the essentially benign findings of his physical examinations (B7F/9), his opinion was rendered after having examined the claimant on two occasions and his opinion was expressed in such a manner that it touched upon an issue, the resolution of which is reserved to the Commissioner of Social Security, or to his designees [SSR 96-5p].  Accordingly, little weight was accorded these opinions.

Tr.  20-21.

Frase first contends that the ALJ's reasoning was in error because Dr. Stasiak's June 22, 2012, opinion was supported by the September 2011 EMG nerve conduction studies.  Doc. 14, p. 12.  However, the ALJ considered the medical record evidence in detail, including the EMG nerve conduction studies and medical examinations (Tr. 16-18), and determined that Frase's "[p]hysical examinations included in the record have consistently, albeit not universally, reported wither [sic] minimal or normal findings," including Dr. Stasiak's June 22, 2012, examination "which reported a normal gait, normal motor strength, of the lower extremities, with 'grossly intact' sensation and normal, symmetrical reflexes." (Tr. 17) (referencing among other exhibits, Exhibit B7F/9 (Tr. 361)).   Although Frase points to the results of the September 2011 EMG nerve conduction studies to argue that Dr. Stasiak's opinions are well-supported (Doc. 14, p. 12), the ALJ clearly considered those studies.[19]  Moreover, Frase fails to argue or demonstrate that the ALJ's finding that Frase's examinations were generally normal or benign, including those of

---

[19] In the context of his treating physician argument, Frase also contends that the ALJ should not have given considerable weight to the opinions of state agency physicians Drs. Bolz and Kylop who opined that Frase was capable of light work because they had not had the benefit of reviewing the September 2011 EMG nerve conductions studies.   Doc. 14, pp. 12-13.  However, as discussed, the ALJ clearly considered the EMG studies and, while the ALJ assigned considerable weight to the opinions of Drs. Bolz and Kylop because she found those opinions generally consistent with the relatively benign physical examination, the ALJ stated that "the introduction of evidence, including the nerve conduction studies (B8F/2), justify inclusions of limitations regarding handling and fingering."  Tr. 20.  Accordingly, Frase's argument that the ALJ erred because he provided considerable weight to opinion evidence without considering the fact that the physicians had not reviewed the EMG studies is unpersuasive.

Dr. Stasiak dated June 22, 2012, (the same date as one of Dr. Stasiak's two opinions), is unsupported by the record.

Frase also argues that the ALJ should have given controlling or more than little weight to Dr. Stasiak's severe physical restrictions because those restrictions were consistent with consultative examining physician Dr. Rodgers' opinion.  Doc. 14, p. 12.  Frase contends that Dr. Rodgers opined that "Frase's ability to do all work-related activities, were limited to 'occasional.'" Doc. 14, p. 12, citing Tr. 346.  Frase misstates Dr. Rodgers' opinion.  Following his examination, Dr. Rodgers concluded:

> My medical assessment of the claimant's ability to do work-related activities include bending, twisting, and overhead work, limited to occasional status.  He has no limitations regarding his hearing, speech, or use of his hands.  He did exhibit markedly decreased vision in the left eye.

> Tr. 346.

Although Dr. Rodgers used the term "occasional" he used that term to describe Frase's bending, twisting and overhead work limitations.  Tr. 346.  Thus, Frase's argument that Dr. Rodgers' opinion was as severe as Dr. Stasiak's opinions and therefore Dr. Stasiak's opinions were consistent with other evidence of record and entitled to controlling weight is unpersuasive.  Further, Frase's argument that the ALJ incorrectly stated that Dr. Rodgers offered no exertional opinion (Doc. 14, p. 12) is without merit.  While Dr. Rodgers noted his examination findings such as decreased shoulder strength, Dr. Rodgers' opinion, as set forth above, did not reference exertional limitations such as limitations in Frase's ability to stand, sit, walk, lift, carry, push or pull.  *See* 20 C.F.R. § 404.1569a (a) (indicating that "classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength of demands for

sitting, standing, walking, lifting, carrying, pushing, and pulling"). Thus, the ALJ did not incorrectly conclude that that Dr. Rodgers offered no exertional opinion.

In light of the foregoing, Frase has not demonstrated that the ALJ erred in not providing controlling weight to Dr. Stasiak's physical impairment opinions.  Additionally, Frase has not demonstrated that the ALJ did not articulate good reasons for providing little weight to Dr. Stasiak's opinions.  Consistent with 20 C.F.R. § 416.927(c), in weighing Dr. Stasiak's opinions, the ALJ considered the supportability of his opinions as well as the brevity of the treatment relationship.  Tr. 20.  As reflected in the record, Dr. Stasiak had only seen Frase three times, one of which was the date on which Dr. Stasiak issued his June 22, 2012, opinion.  Tr. 353-354, 355. Further, in not providing controlling weight to Dr. Stasiak's opinions, the ALJ properly considered the fact that Dr. Stasiak rendered opinions on issues reserved to the Commissioner. Tr. 20.  For example, Dr. Stasiak opined that Frase would miss work entirely because he was disabled.  Tr. 354.  *See* 20 C.F.R. § 404.1527(d) (opinions that would direct the determination of disability, i.e., an opinion that a claimant is disabled or unable to work, is an opinion on an issue reserved to the Commissioner and not considered a "medical opinion"); *see also* SSR 96–5p, 1996 WL 374183, *2 (July 2, 1996) (discussing issues that are administrative findings that are dispositive of a case, e.g., whether a claimant is disabled).

For the reasons set forth above, the undersigned finds that the ALJ's discussion of the evidence and explanation of the weight provided to Dr. Stasiak's physical impairment opinions makes sufficiently clear the weight given to the treating physician's opinion and the reasons for that weight, *Wilson*, 378 F.3d at 544, and those reasons are supported by substantial evidence.[20]

---

[20] While an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).  Thus, to the extent that the ALJ did not specifically discuss each and every factor in 20 C.F.R. 404.1527(c), reversal and remand is not required.

### 2. Dr. Stasiak's mental impairment opinion

With respect to Frase's mental impairments, on June 22, 2012, Dr. Stasiak opined that Frase would be unable to sustain an eight-hour workday, five days per week. Tr. 355. He also opined that Frase would experience symptoms severe enough to interfere with the attention and concentration necessary to perform simple tasks on a daily basis; his ability to get along with co-workers, supervisors and the general public was limited; and he was unable to maintain prolonged concentration. Tr. 356. With respect to Dr. Stasiak's mental impairment opinion, the ALJ stated:

> Little weight was accorded the opinion of the claimant's treating physician, Steven Stasiak, M.D., that the claimant would be unable to work an eight hour, five day work week, that he would have daily interruption of his ability to understand, remember and carry out instructions, that he would be limited in his ability to relate to others, and that he would be unable to respond appropriately to the stressors of day-to-day work. Dr. Stasiak treated the claimant briefly, and although he was reporting within the bounds of his professional certifications, he was not reporting within the bounds of any specialty; moreover, his findings are based on self-reported standard psychological inventories, such that he has effectively permitted substitution of the claimant's opinion for his own.

Tr. 21.

Frase contends that the ALJ should have given controlling weight to Dr. Stasiak's opinion regarding his mental impairments because his opinion was consistent with the opinion of consultative psychologist Dr. Harvan and supported by the opinions of state agency psychologists Drs. Pawlarczyk and Hasksins. Doc. 14, pp. 13-14. However, Frase has failed to demonstrate that the opinions were entirely consistent. For example, Dr. Harvan opined that Frase would have marked limitations in relating to others (Tr. 340-341) whereas Dr. Stasiak only noted that Frase's ability to relate to others would be limited (Tr. 356). Additionally, the ALJ provided only little weight to Dr. Harvan's opinion[21] (Tr. 21) and Frase does not directly

---

[21] As a one-time examining psychologist, Dr. Harvan was not entitled to controlling weight.

challenge the weight provided to that opinion.  Even if, in some respects, Dr. Stasiak's opinion

was consistent with Dr. Harvan's opinion, Dr. Stasiak's opinion was not consistent with Drs.

Pawlarczyk and Haskins.   For example, although Drs. Stasiak and Harvan concluded that

Frase's mental impairments would impact Frase's ability to perform even simple tasks (Tr. 340,

356), Drs. Pawlarczyk and Haskins concluded that Frase would be capable of simple tasks in a

work environment with no strict production quotas where there are only limited periods of

sustained concentration required  (Tr. 99, 147).  The ALJ gave considerable weight to the

opinions of Drs. Pawlarczyk and Haskins[22] and, as reflected in the RFC, the ALJ, consistent with

those opinions, limited Frase to simple, low stress tasks with no strict time requirements or work

that involves high production quotas.  Tr. 15.

In light of the foregoing, Frase has not demonstrated that the ALJ erred in not providing

controlling weight to Dr. Stasiak's mental impairment opinion.  Also, contrary to Frase's

contention, the ALJ provided good reasons for providing little weight to Dr. Stasiak's opinion

regarding Frase's mental impairment.  For example, consistent with 20 C.F.R. § 404.1527(c), the

ALJ considered the brevity of the treatment relationship as well as Dr. Stasiak's lack of

specialization.  Tr. 21.  Also, the ALJ found Dr. Stasiak's opinion entitled to little weight

because his findings were based on self-reported psychological inventories.  *See* 20 C.F.R. §

404.1527(c)(6) (allowing for consideration of other factors when determining the weight to be

provided to a medical opinion).

For the reasons set forth above, the undersigned finds that the ALJ's discussion of the

evidence and explanation of the weight provided to Dr. Stasiak's mental impairment opinion

---

[22] The ALJ found that Dr. Haskins' social restrictions, i.e., superficial contact with others (Tr. 147), were more in
line with the evidence than Dr. Pawlarczyk's social restrictions, i.e., no direct contact with the public and limited
contact with others (Tr. 100).  Tr. 21.

makes sufficiently clear the weight given to the treating physician's opinion and the reasons for that weight, *Wilson*, 378 F.3d at 544, and those reasons are supported by substantial evidence.[23]

**B.     The ALJ properly evaluated the opinion evidence and the RFC is supported by substantial evidence**

Frase separately argues that the RFC is not supported by substantial evidence because the ALJ did not properly weigh the medical opinion evidence.  Doc. 14, pp. 14-15.  Frase's arguments in this regard are similar to the arguments he presents in connection with his treating physician argument.

First, he argues that, because Dr. Stasiak and Dr. Rodgers concluded that Frase was not able to complete a full eight hour day of even sedentary work, the RFC is not supported by substantial evidence.  Doc. 14, p. 14.  However, as discussed above, Dr. Rodgers' opinion was not as inclusive as Frase suggests and the ALJ properly assigned and explained her decision to provide less than controlling weight to Dr. Stasiak's opinions.

Next, Frase argues that the RFC restricting him to light work cannot be supported by the opinions of the Drs. Bolz and Kylop because they did not review the results of the EMG nerve conduction studies.  Doc. 14, p. 14.  However, as discussed above, Frase's contention is without merit because the ALJ took into account the fact that those physicians had not reviewed those studies and the ALJ added further limitations based on the results of those studies.  Tr. 20.

Finally, Frase argues that, because he has marked limitations in concentration and attention, an alternate VE hypothetical more accurately portrayed his abilities such that the ALJ should have found him disabled based on the VE's testimony that there would be no work available to an individual who would be unable to engage in sustained work activity for a full

---

[23] See FN 20 above.

eight-hour workday on a regular and consistent basis due to a combination of medical conditions, pain and mental impairments.[24] Doc. 14, p. 15. Frase's argument is without merit

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. § 404.1545(a); 20 C.F.R. § 404.1546(c). Further, "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . [the] [h]ypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible". *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). When assessing Frase's RFC, the ALJ thoroughly reviewed and considered the evidence, including the medical opinion evidence, EMG nerve conduction studies, evidence of his daily activities, his minimal treatment history even after acquiring a medical card, his lack of use of medication to treat his symptoms and the ALJ assessed the credibility of Frase's statements regarding the limiting effect of his symptoms. Tr. 16-21. The VE testimony upon which the ALJ relied was provided in response to a hypothetical question that accurately portrayed the limitations contained in the RFC. Thus, the ALJ's reliance upon the VE testimony was proper and constitutes substantial evidence and Frase's request for reversal or remand because the ALJ did not adopt or rely on an alternate hypothetical that Frase contends more accurately portrayed his limitations is without merit.

As discussed above, the undersigned finds that Frase has failed to demonstrate that the ALJ erred in her evaluation of the medical opinion evidence and Frase has not demonstrated that the RFC is not supported by substantial evidence.

---

[24] Frase indicates that the described hypothetical was the ALJ's second hypothetical. Doc. 14, p. 15. However, the hearing transcript reflects that the VE hypothetical that Frase contends that ALJ should have relied upon was either the ALJ's third or fourth hypothetical. Tr. 68.

## VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated:  December 1, 2014

_Kathleen B. Burke_
Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).